John A. Chanin, Honolulu, Hawaii, for Aero Filipinas.

Ke-Ching Ning, Honolulu, Hawaii, for debtor.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JON J. CHINEN, Bankruptcy Judge.

On July 16, 1985, Samoa, Inc., dba Samoa Airlines, ("Debtor"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On July 17, 1985, Aero Filipinas, by and through its attorneys, the Law Offices of John A. Chanin, filed a Motion for Relief From Automatic Stay, Or In the Alternative for Turnover of Property. A preliminary hearing was conducted on July 17, 1985. Thereafter, the Court conducted final hearings on July 26, July 30, August 12, and August 26. During the course of the hearings, the Court considered the testimony of Emerson Manawis, a representative of Aero Filipinas, and Ronald Pritchard, President of the Debtor corporation. The court also received into evidence numerous exhibits in the form of documents and the deposition of Ronald Pritchard.

Aero Filipinas requests the return of an aircraft which was originally leased to the Debtor. In particular, Aero Filipinas requests the lifting of the stay provided by 11 U.S.C. § 362(a) and the return of the

**In re SAMOA AIRLINES, INC., Debtor.**

**Bankruptcy No. 85–00326.**

United States Bankruptcy Court,
D. Hawaii.

Sept. 10, 1985.

aircraft. Aero Filipinas also asserts that the aircraft is not property of the estate and that the Debtor therefore should return the aircraft which is wrongfully held in its possession.

The Court having considered the memoranda, affidavits, exhibits, testimony of witnesses, deposition transcripts, arguments of counsel, and the entire record of the case, and being fully advised of the premises therein finds as follows:

## FINDINGS OF FACT

1. On July 6, 1984, Debtor and Aero Filipinas entered into an Aircraft Lease Agreement ("Lease") for the lease of a Boeing 707–351C aircraft. Paragraph III(a) of the Lease states that the term of lease "shall be for a term of six months, commencing from the time of delivery...."

2. At the same time, the parties entered into a Memorandum of Understanding. This document gave Aero Filipinas 30% of the annual gross operating profit of Debtor, to be paid semi-annually. Pritchard testified that this is to be calculated by taking the year-end financial data of the company, calculating the percentage, and then paying the amount due to Aero Filipinas in semi-annual installments.

The Lease and Memorandum of Understanding were drafted by counsel for Aeros Filipinas. Debtor was unrepresented by counsel.

3. Shortly after the execution of the Lease, on July 10, 1984, Aero Filipinas sent a telex to Debtor, disclosing for the first time that Aero Filipinas had made previous commitments to a Japanese charterer for use of the aircraft for charters to be flown during the month of August. It urged Air Samoa "to adjust your schedule in accordance with above info as your guideline for start up operations." Aero Filipinas was aware of the fact that Debtor was anxious to receive the aircraft as soon as possible, so that it could commence the FAA certification process, which had to be completed before Debtor could commence services.

4. As a result of the request of Aeros Filipinas, another Memorandum of Understanding was executed on August 7, 1984 between the Debtor, Aero Filipinas and Nikka Air Service Company, Ltd., the Japanese charterer. This document shows that the charter agreements entered into by Aero Filipinas were made on February 7, 1984 and April 3, 1984. Thus, Aero Filipinas knew at the time it executed the Lease with Debtor on July 6, 1984, that it had these obligations and nevertheless did not disclose these obligations to Debtor.

5. As a result of the second Memorandum of Understanding, dated August 10, 1984, Debtor and Aero Filipinas together cooperated to fly the charters during the month of August 1984. Thus, the aircraft was not delivered in Honolulu, until September 1, 1984.

6. On January 18, 1985, the parties met in Honolulu to discuss their concerns under the Lease. The parties agreed that Debtor would be authorized to pledge the aircraft as collateral for a $1.5 million loan, provided that Debtor paid $500,000.00 from the loan proceeds to Aero Filipinas. This was followed by a written confirmation dated May 3, 1985.

7. At the same time, the parties also discussed an equity participation by Aero Filipinas, whereby it would acquire 51% of the company stock. This proposal was under consideration for the next several months, although Pritchard had a reservation about its legality due to the foreign ownership of Aero Filipinas.

8. Also at this meeting, Emerson Manawis, who was an assistant to Mr. Pritchards, was recruited by Aero Filipinas. Thereafter, Emerson Manawis became the Official Representative of Aeros Filipinas.

9. On January 31, 1985, the parties executed a Lease Extension Agreement, extending the original Lease until March 1, 1985. Pritchard testified that this document evidenced the parties' understanding that, since the aircraft was not delivered until September 1, 1984 in Honolulu, the basic term of the lease would not end until March 1, 1985.

10. On March 1, 1985 and subsequently on April 1, 1985, two additional Lease Extension Agreements were executed between the parties, which further extended the Aircraft Lease Agreement, together with the Memorandum of Understanding executed on July 6, 1984, until May 1, 1985. Pritchard testified that these Extensions extended the basic term of the Lease to May 1, 1985.

11. At the hearing, Aero Filipinas took the position that after May 1, 1985, Debtor had the aircraft on a "day to day lease". However, on cross-examination, Manawis acknowledged that he had not told Pritchard or anyone else from Debtor that Debtor had only a "day to day" lease after May 1, 1985. Further, the evidence showed that on May 3, 1985, Aero Filipinas gave written authorization to Debtor to obtain a $1.2 million loan, using the aircraft as collateral.

12. Between May 1, 1985 and July 1, 1985, Manawis and Pritchard met or communicated on a regular basis several times a week. During these communications, Pritchard made regular reports of the condition of the company to Manawis. This included the fact that in June 1985, South Pacific Island Airways ("SPIA"), a competitor along the same flight route, had been grounded by the FAA, and thus Debtor's situation had improved. Aero Filipinas was also aware, through these communications, that Debtor was entering into many contractual undertakings which required future performance. These included in particular its payment for a "hush kit", of $70,000 per month to Comtran, the maker of the hush kit. Debtor paid a total of $210,000 to Comtran for the hush kit for the months of May, June and July 1985. In addition, during this time, Debtor entered into agreements with Hawaiian Independent Refinery, Inc., a refueler, with the State of Hawaii for lease of office space at the airport, with Hawaii Medical Services Association, with ground handling service operators, as well as with several others.

13. Debtor also sold tickets to the public, which were valid for a year. In particular, Debtor, in June 1985, sold a block of coupons to the Government of American Samoa for $50,000.00. These tickets were not to be used until some future time.

14. During the period between the meeting in January 1985 to early July 1985, Debtor continued to approach lenders, hired a specialist to prepare a loan package, and made applications to lenders for loans, representing to these lenders that the aircraft would be used as collateral. Even Manawis made efforts to obtain a loan on behalf of Debtor, visiting a foreign country for such purpose, but without success.

15. Pritchard testified that in his numerous communications with Manawis, the parties agreed that Debtor may continue to offer the aircraft as collateral to obtain a loan and that Debtor may show it as an asset on its financials. Pritchard felt that, if Aero Filipinas wished to have the aircraft returned, it would give due notice to Debtor, and that thereafter, it would give Debtor a reasonable period of time within which to obtain a replacement aircraft, being 60 to 90 days. Pritchard testified that 60 to 90 days was necessary because that was the time necessary to find and review a replacement aircraft and to negotiate and finalize a lease agreement.

16. Aeros Filipinas contended that a letter of termination dated July 1, 1985 terminated the May 3rd letter of authorization. However, the original envelopes of both the original and the copy of the letters to Victor Sims, an officer of Debtor corporation, were postmarked July 8, 1985. In addition, the parties met on July 7, 1985 and, at this meeting, Manawis delivered a letter to Pritchard stating that the lease "is officially terminated as of Midnight of July 7, 1985." Thus, the Court finds that no notice earlier than July 7, 1985 was given to Debtor, evidencing the intention of Aeros Filipinas to terminate the lease.

17. The Court finds that it is not reasonable for Aero Filipinas to assert that Debtor was on a "day to day lease", since no business, particularly anyone in the airline business, could operate under such constraints. This is particularly so when the

evidence is clear that Debtor did not have notice that this was the position of Aeros Filipinas.

18. Aero Filipinas further contends that the lease provides for only a 20-days notice and that 20-days have expired since the notice of termination of July, 1985.

However, Aeros Filipinas did not demand strict compliance with the lease. Even after the written lease terminated on May 1, 1985, Aeros Filipinas permitted Debtor to use the aircraft for passenger service and to use it as a collateral for a loan. This only could lead Debtor to understand that it may enter into long-term contracts and that, before Aero Filipinas terminates its permission to use the aircraft, Aero Filipinas will give Debtor reasonable notice so that it may acquire a substitute aircraft.

19. Aeros Filipinas knew that no airline can operate on a "day to day basis". To be a successful venture, an airline company must have a long range plan. It must sell tickets in advance for the future to make certain that each flight will not be a losing proposition. It must also enter into certain long-term contracts so that it will have sufficient fuel, proper maintenance, proper airport facilities and sufficient personnel. To do otherwise will be contrary to all good business judgment.

20. Debtor justifiably relied on the conduct of Aero Filipinas in entering into the many contractual obligations with other parties, as well as with members of the public and the government of American Samoa during the period May 1st to early July 1985. Such justifiable reliance led to the payment of at least $210,000 on the Comtran contract. As a result, to permit Aero Filipinas to terminate use of the aircraft without giving Debtor a reasonable period of time to find a substitute aircraft would be unjust and inequitable. Aero Filipinas is estopped from denying the existence of the Lease for a reasonable period after July 7, 1985, the date of the final letter of termination.

## CONCLUSIONS OF LAW

1. The law of the Philippines, which applies in this case under the Aircraft Lease Agreement and the Memorandum of Understanding of July 6, 1985, recognizes the equitable concept of estoppel. *See* Book IV, *Obligations and Contracts*, Title IV, Civil Code of the Philippines; *Tolentino*, Commentary and Juris Prudence on the Civil Code of the Philippines, pages 598, 601.

2. Aero Filipinas is estopped from repudiating its tacit agreement to give reasonable notice to Debtor for the return of the aircraft after the final notice of intent to terminate.

3. In the instant case, Pritchard did not say the reasonable time after notice of termination was 90 days. He said it ranged between 60 to 90 days. Because Debtor is in default for over $500,000.00 and because Debtor has been seeking financing since May of 1985 after the termination of the last written extension period, the Court finds 75 days from July 7, 1985 to be a reasonable "grace period".

4. Thus, Aero Filipinas' Motion herein is denied, provided that Debtor shall return the aircraft to Aero Filipinas by 4:00 p.m. H.S.T. on or before 75 days from July 7, 1985, which is September 20, 1985.

5. However, in requesting equitable treatment, Debtor must do equity. Thus, in the instant case, unless Debtor offers additional security to Aero Filipinas, the court is requiring Debtor to pay forthwith to Aero Filipinas for the current use of the aircraft, based upon a reasonable rent. If the parties cannot agree upon the reasonable rent, the court will determine the reasonable rent. Until such determination, the rent provided for in the lease is deemed reasonable. And, such rent must include the sum necessary to pay for the overhaul of the aircraft engines. Any default will be sufficient cause to automatically grant a lifting of the stay, based upon an affidavit filed by counsel for Aero Filipinas.

Let judgment be entered accordingly.